UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal Action No. 1:22-cr-10065-IT-7 |
| | * | |
| RYAN DUNNELL, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

July 16, 2024

TALWANI, D.J.

Defendant Ryan Dunnell is charged with conspiracy to distribute and to possess with intent to distribute 400 grams or more of fentanyl and 100 grams or more of p-flurofentanyl in violation of 21 U.S.C. § 846. Superseding Indictment [Doc. No. 107]. Pending before the court are Dunnell's Motion to Suppress Evidence Seized from a Warrantless Search of a Ford Fusion on August 4, 2021 ("August 4 Mot.") [Doc. No. 322] and Motion to Suppress Evidence Seized from a Warrantless Search of a Toyota Echo on September 20, 2021 ("September 20 Mot.") [Doc. No. 325]. Because Dunnell lacks standing to assert privacy rights as to either search, and because officers in any event had reasonable suspicion and probable cause sufficient to justify the stops and subsequent searches, both motions are DENIED.

I.      **Background**

A.   *The Drug Trafficking Organization Investigation*

In early 2021, a Drug Enforcement Administration ("DEA") task force began investigating a suspected drug trafficking organization based in Lawrence, Massachusetts. Aff. ISO Criminal Compl. ("Compl. Aff.") ¶ 9 [Doc. No. 1-1]. Investigators believed the organization, run by Defendants Ivan Rodriguez Osorio ("Rodriguez") and Randell Starlin

Medina Rodriguez ("Medina"), was trafficking fentanyl. Aff. of Douglas Ruth ISO Government's Opp. to Mots. to Suppress Evidence ("Ruth Aff.") ¶ 4 [Doc. No. 331-2]. During the investigation, the task force executed multiple controlled purchases from Rodriguez. Id. ¶¶ 6-8. For some purchases, Medina met the buyer in a grocery store bathroom or parking lot and delivered roughly 100 grams of fentanyl. Id. For others, the transactions took place inside vehicles, including a blue 2005 Honda CRV (the "CRV") and a black 2008 Lincoln Navigator (the "Navigator"). Id. ¶¶ 6, 8.

Investigators sought and obtained court authorization to track Rodriguez and Medina's cell phones and vehicles, including the CRV and the Navigator. Id. ¶¶ 5, 9, 14. Through this monitoring, investigators identified customers of the drug trafficking organization, including Dunnell. Id. ¶ 5.

On June 28, 2021, investigators tracked the CRV to the rear lot of a Fairfield Inn hotel in Amesbury, Massachusetts. Id. ¶ 9. Investigators observed a Nissan sedan park in the front lot and a man (later identified as Defendant Douglas Morris) exit the Nissan and walk to the rear parking lot. Id. ¶ 10. Less than 10 minutes later, Morris returned to the Nissan. Id. The CRV left the rear lot of the Fairfield Inn a minute later and made a brief stop before traveling to Rodriguez's residence. Id. Although the investigators did not see Morris while he was behind the hotel, investigators believed based on the other observations that a narcotics transaction took place between Morris and whoever was driving the CRV. Id. ¶ 11. After departing the front lot of the Fairfield Inn, the Nissan traveled on I-95 North into New Hampshire where it was stopped by New Hampshire State troopers. Id. ¶ 12. The officers conducted a vehicle search of the Nissan and seized, among other things, 161 "fingers," or 10-gram packages, of fentanyl. Id. ¶ 13. Morris told the officers that he had paid $35,000 for the drugs and that he had traveled to make similar

purchases on three prior occasions, each time picking up approximately 500 grams of fentanyl. Id.

On July 7, 2021, investigators instigated a purchase through a Confidential Source ("CS") for 100 grams of fentanyl and 100 oxycodone tablets. Id. ¶ 14. Medina picked up the CS in the Navigator, and handed the CS 10 fingers of fentanyl and approximately 100 blue pills. Id.

Around the same time, the CRV departed from what investigators believed to be a stash location for the organization and headed to the Fairfield Inn in Amesbury. Id. ¶ 15. As before, the CRV drove to the back parking lot. Id. Investigators then observed Morris arrive at the Fairfield Inn in a Chevrolet Cruze and park in a different lot than the CRV. Id. ¶¶ 15-16. Morris, carrying a backpack, walked to the CRV, got in the front passenger seat, appeared to have a brief conversation with the driver (who investigators believed was Rodriguez), and then exited the car. Id. ¶ 16. Morris then walked with the same backpack from the back of the hotel to the Chevrolet and drove away. Id. Again, investigators believed they had observed a narcotics transaction. Id.

Investigators followed the Chevrolet onto I-95 where it was stopped by a New Hampshire state trooper. Id. ¶ 17. The trooper observed a male driver, female front seat passenger, and Morris in a rear passenger seat with the backpack. Id. Following a search of the vehicle and the backpack, the trooper seized approximately 169 cylinders of pressed pink powder, weighing roughly 1.7 kilograms, which was later confirmed to be 1670 grams of fentanyl. Id. ¶ 18.

Based on these controlled purchases, observations, and stops, investigators concluded that Rodriguez, Medina, and others in the organization were using vehicles, often the CRV and Navigator, to supply large quantities of fentanyl to customers for redistribution. Id. ¶ 19. Investigators concluded that further surveillance of Rodriguez and Medina's vehicles would lead to observation of narcotics transactions and additional drug seizures. Id.

On July 27, 2021, investigators tracked the Navigator to a Market Basket in Seabrook, New Hampshire. Id. ¶ 20. After Rodriguez was observed leaving the Market Basket, investigators reviewed security footage from the Market Basket. Id. ¶ 23. The footage showed Rodriguez enter the store and go into the restrooms and showed Dunnell enter the restroom while Rodriguez was still inside. Id. A few minutes later, both Dunnell and Rodriguez exited the restroom and the Market Basket, but investigators were unable to determine what vehicle Dunnell entered after he left. Id.

B. *The August 4, 2021 Stop*

On August 4, 2021, investigators tracked the CRV to the Market Basket in Seabrook, New Hampshire. Id. ¶ 24. Investigators established surveillance of the store and observed Dunnell standing in front of the Market Basket carrying a messenger bag and a black and orange case. Id. ¶ 25. The CRV pulled in front of the Market Basket and when it drove away Dunnell was no longer standing outside, leading investigators to believe he had gotten in the vehicle. Id. The CRV drove to an adjacent lot and parked, and shortly thereafter Dunnell exited the vehicle carrying the black and orange case, but not the messenger bag. Id. Investigators believed the CRV was being driven by Rodriguez and that Dunnell gave the messenger bag to Rodriguez in a narcotics transaction. Id.

Dunnell then got into a blue 2020 Ford Fusion (the "Fusion"). Id. The Fusion had Maine plates and was registered to a Beatrix Tucci at an address in Portland, Maine. Id. DEA investigators followed the Fusion as it drove into Maine. Id. ¶ 26. The investigators gave a description of the Fusion to Maine State Police and indicated that they believed that Dunnell, a passenger in the vehicle, had likely been involved in a drug transaction and that there were likely narcotics in the vehicle. Id.

Maine State Police trooper David Lemieux searched Dunnell's name in his police database after receiving the call from the DEA and learned that Dunnell was listed as a subject in several Maine DEA investigations from 2017-2020. Aff. of David Lemieux ISO Government's Opp. to Mots. to Suppress ("Lemieux Aff.") ¶ 3 [Doc. No. 331-3]. From an unmarked cruiser, Trooper Lemieux observed the Fusion heading north on I-95 and began following the vehicle. Id. ¶ 4. After the Fusion exited the highway, Trooper Lemieux witnessed the vehicle driving in the break-down lane and in the bicycle lane before cutting off a pickup truck. Id. Trooper Lemieux activated his blue lights and the Fusion pulled over. Id. ¶ 5. Trooper Lemieux identified the driver as Daniel Tucci. Id. ¶ 5. Trooper Lemieux asked Tucci to step outside the vehicle, and Tucci then stated that they had come from Market Basket in Maine. Id. ¶ 7. Trooper Lemieux also asked Tucci the name of his passenger, and Tucci stated that he did not know. Id.

Trooper Lemieux then questioned Dunnell, who first stated that they were coming from "the clinic" in South Portland and eventually claimed that they were coming from the Market Basket in Biddeford, Maine. Dunnell gave the driver's name as "Danny" and did not provide a last name. Id. ¶ 8.

Based on their inconsistent stories, the fact that neither of them admitted coming from New Hampshire, and other factors, Trooper Lemieux believed that Tucci and Dunnell were involved in some illegal activity. Id. ¶ 10.

Trooper Lemieux called in Officer Shane Stevenson with a K9 to assist. Id. ¶ 11. Officer Stevenson asked Dunnell if he had handled drugs recently because the K9 would be alerted by the odor, and Dunnell stated he had recently handled crack cocaine. Id. Officer Stevenson observed a black and orange bag underneath the front passenger seat, and Tucci said it was not

his. Id. ¶ 12. Officer Stevenson asked Tucci if he consented to a search of his vehicle and Dunnell yelled at Tucci not to let the police search the car. Id. ¶ 12.

Trooper Lemieux went back to his cruiser and Dunnell exited the Fusion and began pacing. Id. ¶ 14. When Trooper Lemieux returned, Dunnell pulled him aside and told him that he "would find something in the vehicle if [he] searched it" and there was fentanyl under the front passenger seat. Id. Trooper Lemieux looked under the seat and found a small orange and black bag. Id. He opened the bag and discovered the drugs, which Dunnell told him was 338 grams of fentanyl. Id. Dunnell stated that he did not want to go to jail and would speak with law enforcement, so Trooper Lemieux searched his person and then transported Dunnell to the police station in his cruiser. Id. ¶¶ 14, 16. At the Maine State Police Barracks, Dunnell, who was not restrained, was questioned by DEA agents, who explained he was free to leave at any time. Ruth Aff. ¶ 29 [Doc. No. 331-2]. Dunnell told the agents that he regularly purchased approximately 250-300 grams of fentanyl from the supplier he had met that day (presumed to be Rodriguez), and that he had purchased 240 grams of fentanyl the previous week from his supplier in the Seabrook Market Basket. Id. He said that his supplier usually drove a CRV. Id. After the interview, Dunnell left the police barracks. Id. ¶ 30.

C.  *Additional Stops and Seizures*

Following the stop on August 4, 2021, and before Dunnell was next stopped on September 20, investigators conducted two additional successful stops of suspected customers of the drug trafficking organization that resulted in fentanyl seizures. The first was a suspected narcotics transaction between Defendant Williams Colon Sanchez, driving the CRV, and Defendant Cortney Moulton in a Market Basket parking lot in Newburyport, Massachusetts. Id. ¶¶ 31-32. Following the transaction, investigators stopped Moulton's vehicle and Defendant

6

Robert Rodriguez fled the scene with a backpack containing 150 grams of fentanyl, which investigators recovered. Id. The second stop was of Defendant Scott Cook after investigators observed a suspected narcotics transaction between Cook and Rodriguez, driving the CRV, in the restroom of the Seabrook Market Basket. Id. ¶¶ 33-35. When investigators stopped Cook's vehicle, they found 211 grams of fentanyl. Id. ¶ 35.

D.  *The September 20, 2021 Stop*

On September 20, 2021, investigators tracked the Navigator heading north on I-95 toward New Hampshire. Id. ¶ 36. The Navigator crossed the border into Maine and entered the Kittery Outlets, in Kittery, Maine. Id. ¶ 37. Investigators observed the Navigator pull to the front of the shopping plaza and saw Dunnell enter the vehicle. Id. ¶ 38. The Navigator drove to a nearby McDonald's and Dunnell then exited the car and walked back through the parking lot to the Kittery Outlets. Id. Investigators believed that Dunnell had purchased drugs from the driver of the Navigator. Id. Dunnell then entered a red Toyota Echo (the "Echo") bearing Maine plates and registered to Patricia Oliver. Id. ¶ 39. The Echo left the parking lot and investigators provided a description of the vehicle to the Maine State Police. Id. ¶ 40.

Maine State Police Sergeant Thomas Pappas was alerted by the DEAs to the Echo's passenger's likely involvement in a drug transaction and conducted a motor vehicle stop after observing that the vehicle had an inoperable license plate light. Aff. of Thomas Pappas ISO Government's Opp. to Mots. to Suppress Evidence ("Pappas Aff.") ¶¶ 2-3 [Doc. No. 331-4]. Sergeant Pappas approached the vehicle and identified the driver as its owner, Patricia Oliver, and its passenger as Dunnell. Id. ¶ 4. Dunnell told Sergeant Pappas that they were coming from the Nike outlet, which Sergeant Pappas knew was in Kittery. Id. Sergeant Pappas asked Dunnell to step outside the vehicle and search Dunnell, with Dunnell's consent, but did not locate any

contraband. Id. ¶ 5. Sergeant Pappas then asked Oliver to step out of the vehicle and asked her to turn out her pockets, but did not find anything. Id. ¶ 6.

Another officer, Corporal Russell, then arrived on the scene with a K9, and Sergeant Pappas asked Corporal Russell to walk the K9 around the Echo and then to report that the K9 had alerted to the presence of narcotics. Id. ¶ 7. Corporal Russell and Sergeant Pappas searched the vehicle but did not find any drugs. Id. ¶ 8. Sergeant Pappas then advised Oliver that a female officer was coming to the scene to search Oliver and asked her again if she had anything on her person. Id. Oliver pulled a small baggie out of her waistband. Id. The baggie contained roughly 100 grams of fentanyl. Id. Oliver told investigators that Dunnell had given her the drugs after they went to the Nike Outlet and McDonald's. Id.

Sergeant Pappas searched Dunnell's person again but found no contraband. Id. ¶ 9. Dunnell claimed not to have knowledge of the drugs found on Oliver. Id. Corporal Russell then informed Sergeant Pappas that Dunnell wanted to speak with him. Id. ¶ 10. Dunnell told Sergeant Pappas that he had recently been caught with drugs and did not want to go to jail, and that the drugs from both stops came from the same supplier. Id. Sergeant Pappas confiscated the fentanyl and released Oliver and Dunnell. Id. ¶ 11.

## II.    Discussion

Dunnell moves to suppress all evidence obtained and statements made during the August 4, 2021 stop of the Fusion and the September 20, 2021 stop of the Echo. As to both stops, Dunnell alleges that the officer executing the stop and search did not observe any traffic violations to initiate the stop. August 4 Mot. 1 [Doc. No. 322]; September 20 Mot. 1 [Doc. No. 325]. He further alleges that (1) neither stop was supported by probable cause, nor was there probable cause to subsequently search the vehicle; (2) the searches of both vehicles were

conducted without warrants and without Dunnell's consent to the search of the vehicle or its

contents; (3) the searches were not incident to lawful arrest; (4) the objects seized were not in

plain view of the officers; and (5) the facts known to the officers at the time of the stops were

insufficient to establish evidence of criminal activity and so violated his Fourth Amendment

right to be free of unreasonable search and seizure. August 4 Mot. 1-2 [Doc. No. 322];

September 20 Mot. 1-2 [Doc. No. 325]. Lastly, as to the August 4, 2021 stop, Dunnell seeks to

suppress all statements he made subsequent to the stop as "fruits of the poisonous tree." August 4

Mot. 2 [Doc. No. 322].

　　　The government responds that Dunnell lacks standing to challenge either search where he

neither owns the vehicles at issue nor has established any historical or regular use of the

vehicles.[1] Government's Opp. to Def.'s Mots. to Suppress Evidence ("Gov't Opp.") 8 [Doc. No.

331]. The government contends further that, even if Dunnell had standing, the searches were

supported by facts sufficient to find both reasonable suspicion and probable cause. Id. at 11.

　　　A. *Reasonable Expectation of Privacy*

　　　"To prevail on a claim that a search or seizure violated the Fourth Amendment, a

defendant must show as a threshold matter that he had a legitimate expectation of privacy in the

place or item searched." United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011) (citing

Minnesota v. Olson, 495 U.S. 91, 95 (1990)). This inquiry involves a two-part test: "first,

whether the defendant had an actual, subjective, expectation of privacy; and second, whether that

---

[1] Though the term "standing" is commonly used in this context, the First Circuit has noted the Supreme Court's statement that "the threshold analysis is 'more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" United States v. Lipscomb, 539 F.3d 32, 36 (1st Cir. 2008) (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998))); United States v. Symonevich, 688 F.3d 12, 18 n.3 (1st Cir. 2012) (same).

expectation is one that society is prepared to recognize as objectively reasonable." Id. at 48-49 (citation and quotation omitted).

Though passengers in vehicles have standing to challenge the lawfulness of a stop, see Brendlin v. California, 551 U.S. 249, 251 (2007), they do not necessarily have standing to challenge the lawfulness of a search of that vehicle. See United States. v. Starks, 769 F.3d 83, 89 n.5 (1st Cir. 2014). "[N]o bright line rule determines whether a person has a reasonable expectation of privacy in a vehicle; instead, the court considers a number of factors: ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." United States v. Almeida, 748 F.3d 41, 47 (1st Cir. 2014) (citing United States v. Aguirre, 839 F.2d 854, 856-57 (1st Cir. 1988)). In short, the court looks instead "to whether the individual thought of the place (or the article) as a private one, and treated it as such." Id.

"[A] passenger who has 'asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized,' has made no showing that he or she has a legitimate expectation of privacy in, for example, the area under the seat of the car in which he or she was 'merely [a] passenger [].'" United States v. Symonevich, 688 F.3d 12, 19 (1st Cir. 2012) (quoting Rakas v. Illinois, 439 U.S. 128, 148 (1978)); see also United States v. Lochan, 674 F.2d 960, 965 (1st Cir. 1982) (holding defendant had no privacy right in a vehicle that had been searched, because defendant "did not own the car, nor was there evidence that he had used the car on other occasions. There was no evidence as to the responsibility or control [the defendant] had over the automobile[.]").

10

Similarly, in United States v. Sanchez, the court observed that "a history of regular use of the [car]" or a "pattern of permission, together with [] sole control on a long trip, would have minimized the informal and temporary nature of this . . . acquisition of the car." 943 F.2d 110, 114 (1st Cir. 1991). While ownership, formal and lengthy possession, or a pattern of use may help establish a defendant's reasonable expectation of privacy, casual possession, or informal and temporary use, cannot establish a legitimate expectation of privacy for a passenger or infrequent user of a vehicle. See Almeida, 748 F.3d at 48.

Further, a passenger's possessory interest in an item in a vehicle does not establish a reasonable expectation of privacy when that item is placed in areas where the passenger has no reasonable expectation of privacy. "[H]ad [the defendant] placed his drugs in plain view, he would still have owned them, but he could not claim any legitimate expectation of privacy." Symonevich, 688 F.3d at 21 (quoting Rawlings v. Kentucky, 448 U.S. 98, 106, (1980)).

B. *Warrantless Search of an Automobile*

1. Investigatory Stops and Reasonable Suspicion

"A temporary detention of an individual during a traffic stop by police constitutes a seizure to which the protections of the Fourth Amendment apply." United States v. Cruz-Rivera, 14 F.4th 32, 43 (1st Cir. 2021) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1976)). "An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (citing Whren v. United States, 517 U.S. 806, 810 (1996)). Though a traffic stop is typically brief, "such a stop can be extended where there is reasonable suspicion of further criminal wrongdoing." Cruz-Rivera, 14 F.4th at 43. "No simple, mechanical formula tells us what reasonable suspicion is, though we know that it is less than probable cause and more than a

11

naked hunch . . . [C]ourts must gauge its presence in a commonsense, case-by-case way, taking

in the whole picture." McGregor, 650 F.3d at 821. The First Circuit has said that the

reasonableness determination "entails a measurable degree of deference to the perceptions of

experienced law enforcement officers," United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008),

"based on the totality of the circumstances," Florida v. Harris, 568 U.S. 237, 244 (2013).

      2.  Probable Cause

The automobile exception to the Fourth Amendment's prohibition on illegal searches and

seizures allows a law enforcement officer to perform a warrantless search of a vehicle where the

officer has probable cause to believe that the vehicle contains contraband. See Carroll v. United

States, 267 U.S. 132, 154 (1925). Where law enforcement has probable cause to search a

container in a car, the automobile exception also allows the search of that container without first

obtaining a warrant. See California v. Acevedo, 500 U.S. 565, 580 (1991) ("The police may

search an automobile and the containers within it where they have probable cause to believe

contraband or evidence is contained").

    C.  *The August 4, 2021 Stop*

      1.  Officers had Reasonable Suspicion for the Investigatory Stop

Dunnell alleges that the stop of the vehicle was neither precipitated by a traffic infraction

nor supported by reasonable suspicion.

As to the traffic infraction, the stop was permissible based on Trooper Lemieux's

statement that he observed the Fusion driving in the break-down lane and in the bicycle lane

before cutting off a pickup truck.

With regard to reasonable suspicion, Dunnell contends that the facts known to the DEA

agents and Trooper Lemieux at the time of the stop were insufficient to establish that Dunnell

was connected to the commission of a particular crime. But the affidavits of both Task Force Officer Ruth and Trooper Lemieux demonstrate reasonable suspicion to both stop the Fusion and to extend the stop into an investigative stop based on the drug-related information. See United States v. Pontoo, 666 F.3d 20, 26 (1st Cir. 2011) (describing requirements of a Terry investigatory stop) (citing Terry v. Ohio, 392 U.S. 1, 19-20 (1968)).

Prior to the stop, Lemieux learned from the DEA that Dunnell, a passenger in the Fusion, was likely involved in a narcotics transaction, and from his own database search that Dunnell was the subject of several Maine DEA investigations from the prior year. Id. ¶¶ 3-4. The traffic violations, along with the information from DEA agents that the Fusion was being used to transport narcotics after a recent drug transaction, formed a reasonable suspicion in Lemieux's mind that the Fusion was being used for illegal activity. Id. ¶ 2.

Additionally, the DEA had sufficient information to connect Dunnell to prior drug transactions, providing reasonable suspicion that his activity on August 21 was also narcotics related. Prior to August 21, 2021, the DEA observed Defendants Rodriguez, Medina, and Morris transact narcotics using the Navigator and CRV in parking lots and grocery store restrooms, and that these transactions usually occurred when Rodriguez or Medina traveled north to New Hampshire or Maine. The DEA had also stopped Morris on two occasions after picking up large quantities of fentanyl from Rodriguez. Investigators also had video footage of Dunnell meeting with Rodriguez in a Market Basket bathroom, which was consistent with the organization's modus operandi for drug transactions.

On the day of the stop, officers observed the CRV drive north to Seabrook, New Hampshire, to the same Market Basket where officers had observed a suspected narcotics transaction on July 27, 2021. Officers then observed Dunnell get into the CRV with a messenger

bag and black and orange case. Shortly after, Dunnell exited the CRV without the messenger

bag. Based on their knowledge of the trafficking organization's modus operandi and

observations of prior transactions, the officers concluded that the driver of the CRV, likely

Rodriguez, had executed a drug sale with Dunnell.

These articulable facts, taken together, gave the DEA agents and Trooper Lemieux

reasonable suspicion of criminal wrongdoing which justified Lemieux extending the traffic stop

into an investigative one. See Cruz-Rivera, 14 F.4th at 44 (noting that the officers were justified

in extending a vehicle stop to ask investigative questions in part because they had learned from

another officer that the vehicle had come from a drug distribution area and had likely been

involved in a drug transaction).

### 2.   Defendant Lacked a Reasonable Expectation of Privacy in the Fusion

Dunnell has not met his burden of demonstrating that he had a legitimate expectation of

privacy in the Fusion to challenge the search of the vehicle or his bag. See Battle, 637 F.3d at 48.

Under the factors outlined in Almeida, Dunnell had no reasonable expectation of privacy

in the vehicle. 748 F.3d at 47. Dunnell was not the owner of the Fusion and was not in

possession or control of the vehicle at the time of the stop. The driver of the Fusion, who shared

the owner's last name, did not know Dunnell's name, and Dunnell did not know the driver's last

name, Lemieux Aff. ¶ 7 [Doc. No. 331-3], indicating Dunnell's loose ties to the vehicle. Dunnell

has claimed no pattern of use of the Fusion and the ride taken was a relatively short trip from

Seabrook, New Hampshire to Portland, Maine. Id. ¶ 5; cf. Sanchez, 943 F.2d at 114 (noting that

a defendant's "sole control" of a vehicle on a "long trip," coupled with a pattern of permission,

could establish a reasonable expectation of privacy). Taken together, Dunnell's lack of

ownership, control, and familiarity with the car and driver make it unreasonable for Dunnell to

have had an expectation of privacy in the Fusion. See Almeida, 748 F.3d at 47; Lochan, 674 F.2d at 965.

Moreover, Dunnell lacked a reasonable expectation of privacy in the space beneath the passenger seat of the vehicle. In Symonevich, the defendant claimed his Fourth Amendment rights were violated when an officer searched under the seat of a vehicle in which the defendant was a passenger and located a can of tire puncture sealant containing heroin. 688 F.3d at 21. The First Circuit rejected defendant's challenge to the search where "he placed the can under the seat, an area in which he had no reasonable expectation of privacy." Id. Following Symonevich, the court finds that Dunnell has not shown he had a privacy right in either the Fusion or the area under the passenger seat. 688 F.3d at 21.[2]

      3.   Officers had Probable Cause Supporting Their Search of the Fusion

Even if Dunnell had a reasonable expectation of privacy in the Fusion or his black and orange case, Trooper Lemieux was justified in performing a warrantless search because he had probable cause to believe the vehicle and case contained contraband. See Carroll, 267 U.S. at 154. Dunnell and the driver of the Fusion, Tucci, gave Lemieux inconsistent answers to

---

[2] Dunnell's Motion to Suppress [Doc. No. 322] and supporting affidavit [Doc. No. 323] do not assert a distinct possessory interest in the black and orange case that rendered search of the case unconstitutional even if search of the vehicle was permissible. Had such a possessory interest been asserted, the assertion arguably is addressed by Symonevich, which found no expectation of privacy restricting the search of the aerosol can found under a passenger seat. 688 F.3d at 21. But the First Circuit and the Supreme Court have recognized a defendant's privacy right in personal property like a purse or a suitcase located in a space where the individual had no expectation of privacy. United States v. Meada, 408 F.3d 14, 22 (1st Cir. 2005) (recognizing general expectation of privacy in items placed in a closed container); Arkansas v. Sanders, 442 U.S. 753, 763 (1979) (recognizing expectation of privacy in items that are common repositories for personal effects), overruled on other grounds by California v. Acevedo, 500 U.S. 565, 579 (1991). The court need not resolve this issue where Dunnell has not asserted a distinct possessory interest in the black and orange case and officers in any event had probable cause supporting their search as discussed below.

investigatory questions and Lemieux had reason to believe drugs were present in the Fusion after the call from the DEA, the DEA's observations from the ongoing investigation, Dunnell's activity that day, and Lemieux's own search of the police database for Dunnell's name. Lemieux Aff. ¶¶ 3-10 [Doc. No. 331-3].

Lemieux's reasonable suspicion of illegal activity that justified the stop "ripened into probable cause" to search the Fusion as a result of his observations at the scene. See Cruz-Rivera, 14 F.4th at 44, 46 (finding officer's reasonable suspicion regarding presence of drugs evolved into probable cause for search after officer evaluated the vehicle occupants' actions and responses during stop and found significant inconsistencies). Lemieux's post-stop investigation and observations of the Fusion and its occupants included that neither Tucci nor Dunnell admitted coming from New Hampshire, that Dunnell refused to answer questions, that Tucci did not know Dunnell's name and Dunnell did not know Tucci's last name, and that Dunnell told Lemieux that "there were 30 grams of fentanyl inside the vehicle." Lemieux Aff. ¶ 14 [Doc. No. 331-3].

Additionally, Tucci had given Officer Stevenson someone else's prescription medication and Dunnell had told Stevenson he had recently handled crack cocaine. Lemieux Aff. ¶¶ 11-12 [Doc. No. 331-3]. When Officer Stevenson first spotted the black and orange case, he asked Tucci if he had any issues with officers searching the vehicle, and Dunnell began to yell at Tucci, telling him to not allow police to search the vehicle. Id. ¶ 12. This reaction, coupled with the information Lemieux had from the DEA and the police database, gave officers probable cause to believe that drugs might be found in the main cabin of the Fusion and in the black and orange case. Trooper Lemieux was justified in searching both the vehicle and the black and orange case

within it because the totality of the circumstances gave him probable cause that contraband was present in those areas. See Acevedo, 500 U.S. at 580.

Accordingly, even if Dunnell has standing to challenge the search of the black and orange bag, the officers had probable cause to search the vehicle and its contents without a warrant. Accordingly, Dunnell's Motion to Suppress Evidence Seized from a Warrantless Search of a Ford Fusion on August 4, 2021 is DENIED.

D. *The September 20, 2021 Stop*

1. Officers had Reasonable Suspicion for the Investigatory Stop

Dunnell argues that the stop of the Echo was not supported by reasonable suspicion or probable cause. Dunnell contends that Sergeant Pappas did not observe any traffic violations prior to the stop and did not have probable cause to either stop the Echo or search it. Sept. 20 Mot [Doc. No. 325]. But Sergeant Pappas asserted in his affidavit that he pulled the car over after observing an inoperable license plate light on the Echo. Pappas Aff. ¶ 3 [Doc. No. 331-4]. Additionally, before the stop, DEA agents had called Pappas to let him know that the Echo had been seen leaving a drug transaction and was believed to be carrying narcotics, giving Pappas reasonable suspicion that the Echo was being used for illegal activity. Based on the information from the DEA about the Echo, and taking into account Pappas's 15 years of experience as an officer, it was reasonable for Pappas to make the stop and then extend it for investigatory questions. Id. ¶ 1-2; see Ruidiaz, 529 F.3d at 29; Harris, 568 U.S. at 244.

2. Defendant Lacked a Reasonable Expectation of Privacy in the Echo

Dunnell has also not met his burden of demonstrating that he had a legitimate expectation of privacy in the Echo or in the drug's found on Patricia Oliver's person. See Battle, 637 F.3d at 48.

Under the factors outlined in Almeida, Dunnell had no reasonable expectation of privacy in the vehicle. Dunnell did not own the Echo, which belonged to the driver and registered owner Patricia Oliver. Pappas Aff. ¶ 4 [Doc. No. 331-4]. Dunnell was not driving the Echo at the time of the stop and had no historical pattern of use, control, or access to the Echo. The Echo was pulled over near Saco, Maine, a short half-hour ride from its origin in Kittery, so Dunnell was only in the Echo for a short trip. Id. ¶ 3; cf. Sanchez, 943 F.2d at 114. Dunnell has not alleged any possession or ability to regulate access over the Echo. Id. Dunnell lacked ownership, control, and possession of the Echo, see Almeida, 748 F.3d at 47, and had no reason to think of the vehicle as a "private [place]" for himself as an individual. Id.

Dunnell also has not demonstrated that he had a reasonable expectation of privacy in the drugs Oliver turned over to law enforcement. Oliver voluntarily informed Sergeant Pappas of the presence of drugs on her person. Pappas Aff. ¶ 8 [Doc. No. 331-4]. Only after she removed the drugs from her waistband did Dunnell tell Pappas he had given the drugs to Oliver earlier that night. Id. ¶ 10. Even if Dunnell originally had a possessory interest in the drugs, he relinquished that interest when he transferred possession to Oliver. See Maryland v. Macon, 472 U.S. 463, 469 (1985) (holding a seizure, defined as a meaningful interference with an individual's possessory interests, had not occurred because respondent had voluntarily transferred possessory interest in magazine to another person). And Dunnell could not have a reasonable expectation of privacy in drugs found on another person. See Symonevich, 688 F.3d at 21.

Accordingly, Dunnell lacks standing both to challenge the search of the Echo and the search of Oliver's person.

3.   Officers had Probable Cause Supporting Their Search of the Echo

Even if Defendant had standing to challenge the search of the Echo, Sergeant Pappas'

search of the vehicle was constitutional under the automobile exception because the information

he had from the DEA about the Echo recently leaving a drug transaction created probable cause

to believe the Echo contained narcotics. Pappas Aff. ¶ 3 [Doc. No. 331-4]; see Carroll, 267 U.S.

at 154. DEA agents had witnessed a drug transaction that day that was nearly identical in nature

to drug transactions observed on June 28, July 7, and August 4, 2021, each of which then led to

an almost-immediate seizure of drugs from the vehicle used by the suspected buyer. Ruth Aff.

¶¶ 9-13, 14-19, 24-30 [Doc. No. 331-2]. This pattern of vehicle use, along with Dunnell's

behavior before getting into the Echo with Oliver, gave DEA agents probable cause to believe

that the Echo was now transporting narcotics. Id. ¶ 38. This same information, then

communicated to Pappas, gave Pappas probable cause to search the Echo. The totality of the

circumstances leading to the stop and the information received by Pappas about the recent likely

drug transaction gave him probable cause to believe the Echo contained contraband and justified

a warrantless search. See Acevedo, 500 U.S. at 580.

Accordingly, because Dunnell lacks standing to challenge either the search of the Echo or

the search of Oliver, and because, regardless of standing, officers had reasonable suspicion and

probable cause to stop and search the vehicle, Dunnell's Motion to Suppress Evidence Seized

from a Warrantless Search of a Toyota Echo on September 20, 2021 [Doc. No. 325] is DENIED.

**III.    Conclusion**

For the foregoing reasons, Defendant's Motion to Suppress Evidence Seized from a

Warrantless Search on August 4, 2021 [Doc. No. 322] and Defendant's Motion to Suppress

Evidence Seized from a Warrantless Search on September 20, 2021 [Doc. No. 325] are

DENIED.

     IT IS SO ORDERED.

July 16, 2024                       /s/ Indira Talwani
                                                      United States District Judge